1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ISIAH CAMPBELL,                          No.  2:21-cv-2369-WBS-CKD P

12                   Petitioner,

13          v.                                  FINDINGS AND RECOMMENDATIONS

14    PATRICK EATON,

15                   Respondent.

16

17          Petitioner Isiah Campbell, a state prisoner, proceeds without counsel with a petition for a

18    writ of habeas corpus under 28 U.S.C. § 2254. Petitioner stands convicted of multiple counts of

19    pimping and pandering and challenges a 2018 judgment entered in the El Dorado County

20    Superior Court. Petitioner asserts the following claims:

21          Claim One: The trial court erred in instructing the jury it did not matter that a Jane Doe

22    was already a prostitute (ECF No. 1 at 20-31);

23          Claim Two: The trial court erred in instructing the jury he could be convicted because he

24    "successfully persuad[ed] / procur[ed] a Jane Doe to become a prostitute" (id. at 32-43);

25          Claim Three: Penal Code 266i(a)(1) is unconstitutionally vague and the state court's

26    enlargement of the statute, applied retroactively, violated due process (id. at 44-56);

27          Claim Four: There was insufficient evidence for the jury to find petitioner guilty of

28    pandering by procuring as charged in counts 10 through 17 (id. at 57-70);

                                                1

Claim Five: Trial counsel rendered ineffective assistance in failing to object to testimony based on lack of foundation and hearsay (id. at 71-84); and

Claim Six: The trial court erred in instructing the jury that evidence of prior misdemeanor domestic misconduct could be considered in determining petitioner's credibility (id. at 85-113). For the reasons set forth below, it is recommended that the petition be denied.

## BACKGROUND

The California Court of Appeal for the Third Appellate District provided the following summary of the facts presented at trial. These facts are presumed correct unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

> [Jane Doe ("JD")]1's Testimony
>
> JD1 is from Serbia. When she lived there, she occasionally had sex with men in exchange for money or favors, which was an acceptable and a common occurrence at the time.
>
> Around 2008, JD1 immigrated to the United States. Thereafter, she married a man named Rade and worked various jobs. At some point, she posted an advertisement on Backpage.com, a classified advertising Web site commonly used to advertise for prostitution activities, and had sex with men in exchange for money or favors "from time to time."
>
> In early 2014, JD1 met defendant online and they began exchanging messages. They met in person about a year later. Shortly thereafter, she became pregnant. At the time JD1 met defendant in person, she was living at a motel in Sacramento. Although JD1 and Rade never "formally separated," they had gone their "separate ways" by 2015.
>
> Defendant was good with computers and came up with a plan in early 2015 to make money and travel by having JD1 engage in sex for money. As part of the arrangement, he took pictures of her, designed and posted advertisements for her on the Internet (e.g., Backpage.com), established the prices she charged for specific sexual acts, negotiated the "meet up" or "dates"[1] (which largely took place in hotel rooms), booked hotels for her, drove her around as necessary, and protected her. In return, she agreed to split her earnings with him equally.
>
> Defendant set up dates for JD1 in Seattle and various cities in the Sacramento area, the San Francisco Bay Area, the Central Valley,

---

[1] "Defendant linked JD1's phone number to his Google Voice account, which allowed him to read and respond to any text message she received from a client, i.e., a person seeking to engage in sexual acts in exchange for money." People v. Campbell, 51 Cal. App. 5th 463, 470 n. 3 (2020).

and Southern California. During the dates, he would wait outside the hotel or somewhere nearby.

Defendant used fear and violence to dominate and control JD1. Following the birth of their daughter in December 2015, JD1's relationship with defendant changed for the worse. He became controlling and violent. He dictated when and where she would engage in prostitution activities and forced her to work all day, including shortly after giving birth. He decided where she lived and when she could see her daughter. He had sex with her against her will and occasionally beat her before they had sex. He also beat her if she failed to follow his directions or if she expressed her opinion. The beatings occurred frequently, about "every other day." On a few occasions, the beatings were "very bad, very, very bad."

JD1 attempted to end her relationship with defendant several times. However, he would eventually find her and "bad things would happen," including an incident where he beat her and hit their daughter. In addition to his violent and controlling behavior, defendant decided to take a larger share of JD1's earnings. He took her bank card and withdrew money from her account without her permission to pay for his personal expenses and expenses related to other women with whom he was working. When she complained about how he was handling her earnings, he beat her.

JD1 worked with defendant until he was arrested in March 2017. During the time period she worked with defendant, he also worked with JD2, JD3, JD5, JD6, JD7, JD8, JD9, JD10, and JD11. Although JD1 never worked with JD4, she recognized JD4 from a photograph and noted that defendant had told her that he worked with JD4. When asked, JD1 explained that "working" for the women meant exchanging sex for money.

The Sting Operation

On March 16, 2017, detectives from the El Dorado County Sheriff's Department conducted an undercover human trafficking sting operation at the Best Western Motel in Placerville. After researching various Web sites, an undercover investigator set up a date with JD1 at the motel.

At 8:45 p.m., defendant dropped JD1 off at the motel. After she and the undercover investigator agreed on the sex act to be performed and she received the negotiated sum of $300, officers entered the room and detained her. Meanwhile, officers approached defendant's car and detained him. A search of his person revealed the following items: approximately $2,000 in cash, two cell phones (hereafter, HTC cell phone & ZTE cell phone), some currency from the Philippines, a credit card, a bank deposit receipt in the amount of $1,100, and a receipt from a 7-Eleven store in Seattle.

JD2's and JD3's Testimony

JD2's and JD3's testimony was similar to and consistent with JD1's

3

testimony.[2] They both began working with defendant, who referred to himself as "Pharaoh" the tech/computer savvy personal assistant, after he promised to provide them Internet advertising services in exchange for a share of their earnings from prostitution activities. He gave them "professional" names and linked their phone numbers to his Google Voice account, which allowed him to monitor their communications and to communicate with clients on their behalf. He placed advertisements for them online (e.g., Backpage.com), set up their dates with clients, established the prices they charged for specific sex acts, booked their hotel rooms, drove them to meet clients, and waited nearby during their dates. He also provided JD2 with condoms and lubrication, and supplied some of the women with drugs.

Defendant was physically and verbally abusive to JD2. While he did not physically abuse JD3, he threatened her with physical violence and verbally abused her. He was also controlling over JD2 and JD3 and frequently angry. He demanded that the women he worked with stay in their hotel rooms all day; they were allowed to leave only with his permission. He decided how many dates the women would go on and attempted to make JD3 engage in sexual acts she was not comfortable with, including sex without a condom and allowing a client to urinate in her mouth. He also decided when the women had earned enough money to travel to a new location. At some point, he decided to take a larger share of JD2's and JD3's earnings. He also took JD2's bank card and withdrew money from her account to pay for expenses related to other women working with him.

During the time period JD2 worked with defendant, he also worked with JD1, JD3, JD5, JD6, JD8, JD9 and JD11. At times, JD2 worked with JD1, JD3, and JD5. She explained that she occasionally shared a room with these women, and that the "work" the women engaged in was exchanging sex for money. According to JD2, defendant treated JD1 better than the other women he worked with and seemed to care about her more and was more controlling over her. When asked, JD2 said that she saw defendant provide JD1 with condoms and lubrication.

During the time period JD3 worked with defendant, he also worked with JD1, JD2, JD6, JD8, and JD11. JD3 estimated that approximately 10 different women worked with defendant from the summer of 2016 to early 2017. When asked, JD3 indicated that the "work" the women engaged in was exchanging sex for money. She noted that she shared a room with JD1, JD6, JD8, and JD11.

After defendant was arrested, he called JD2 from jail and asked her to change the passwords to some of his accounts, including his Hotels.com account and his "pinknjuicy" and "yunggoon" e-mail accounts. He explained that she needed to do this because he "got caught human trafficking." He also told her not to talk to the police.

---

[2] "While the amended information charged defendant with committing sex offenses against 12 women, only three of those women testified at trial—JD1, JD2, and JD3." Campbell, 51 Cal. App. 5th at 471 n. 4.

Police Contact in Galt

Around 12:15 a.m. on August 17, 2016, a Galt police officer found defendant asleep in his car, which was parked in a city parking lot. A search of the car revealed the following items: a large quantity of condoms, vaginal fungus cream, female hygiene products and toiletries, a bottle of Extenze pills (a male sex enhancement supplement), a piece of paper containing a list of e-mail addresses and passwords (one of which had JD5's name next to it), a laptop computer, and multiple motel keys and digital cameras. When the officer opened the laptop, he observed an e-mail account with a "bunch" of e-mails, one of which was asking about availability and prices for different sex acts. The laptop also contained numerous photos of women wearing lingerie or very little clothing.

When defendant was searched, the officer found cash, credit cards, and wire-transfer receipts in the amount of $1,030 and $130.

Electronic Evidence

Following defendant's arrest, the police monitored his jail calls. During one of those calls, he asked a woman to change the passwords to his Backpage.com account and his nottierose@xxxxx.com e-mail account. In doing so, he revealed the passwords to those accounts. Thereafter, a search warrant was obtained for several e-mail accounts associated with defendant: nottierose@xxxxx.com, zaemai@xxxxx.com, pinknjuicyqueens@xxxxx.com, and yunggoon.blogspot@xxxxx.com. The search yielded a large data file, which included folders for each of the women involved in this case, i.e., JD1 through JD12. Inside the folders were pictures of the women, some of which showed them posed in provocative positions. The women were partially nude or barely clothed in the pictures. The data file also contained a photograph of defendant and photographs of many of the women involved in this case in a file named "PinknJuicy Logo Designs."

A search warrant was also obtained for information from Hotels.com related to defendant's zaemai e-mail address. The information obtained from the execution of this warrant showed that between December 1, 2015, and March 15, 2017, this e-mail address was used in 432 hotel reservations with Hotels.com. The hotels were located in Seattle, and in various locations throughout the San Francisco Bay Area, the Sacramento area, Yuba City, the Central Valley, and Southern California. The reservations were made under the names of defendant, JD1, JD2, JD3, JD7, JD8, JD9, JD10, and JD11.

A search warrant was also obtained for documents from Backpage.com related to phone numbers and an e-mail address (pinknjuicyqueens@xxxxx.com) associated with defendant. In response to the warrant, Backpage.com provided law enforcement over 1,000 portable document format (PDF) files, all of which referenced the user name nottierose. The search revealed the following: From May 23, 2015, to March 15, 2017, there were 241 posts for JD1. From October 16, 2016, to March 16, 2017, there were 249 posts for JD2. From April 11, 2016, to November 14, 2016, there

were 74 posts for JD3. From January 31, 2016, to February 22, 2016, there were two posts for JD4. From August 9, 2016, to February 2, 2017, there were 38 posts for JD5. From April 11, 2016, to November 12, 2016, there were 20 posts for JD6. From May 31, 2016, to September 16, 2016, there were 28 posts for JD7. From November 5, 2015, to December 18, 2016, there were 76 posts for JD8. From November 9, 2015, to March 16, 2017, there were 87 posts for JD9. From March 29, 2016, to May 21, 2016, there were 23 posts for JD10. From December 22, 2015, to November 30, 2016, there were 27 posts for JD11. From December 12, 2015, to November 30, 2016, there were six posts for JD12.

The posts (i.e., advertisements) included barely clothed images of the women posed in provocative positions. Some of the images contained nudity.

Cell Phone Evidence

A search of defendant's HTC cell phone disclosed that he had logged into the Backpage.com account with the user name nottierose on multiple occasions on the day he was arrested. The data on the phone also showed that he had user accounts for various Web sites, including Backpage.com, Hotels.com, and Reddit.com. The phone also had Google Voice service, which was associated with the nottierose e-mail address.

The HTC cell phone contained numerous e-mails from Backpage.com and Google Voice that were sent to the nottierose e-mail address. In some of the e-mails from Backpage.com, defendant's name was printed underneath the nottierose e-mail address. The HTC cell phone contained a list of 1,243 contacts, including zaemai@xxxxx.com, ladydianatheprincess@xxxxx.com, pinknjuicyqueens@xxxxx.com, nottierose@xxxxx.com, and yunggoon.blogspot@xxxxx.com. The contact profile for the zaemai e-mail account referenced defendant's ZTE cell phone number. The contact profile for defendant referenced the nottierose e-mail account.

A search of defendant's ZTE cell phone disclosed files with folders for some of the women involved in this case. The phone also had various applications (or "apps") on it, including apps for Hotels.com and Google Voice, and contained nearly 13,000 e-mails from Backpage.com indicating that advertisements had been renewed or moved to the top of the list. The e-mails were sent to the nottierose e-mail address, which was associated with defendant's name in the phone's contact list. In some of the e-mails from Backpage.com, defendant's name was in the body of the e-mail.

The ZTE cell phone also contained various other prostitution-related information (e.g., information related to Backpage.com advertisements) as well as images and/or messages involving JD1 through JD11 and Rade. There was also information related to JD1's and JD2's bank cards.

The HTC cell phone and ZTE cell phone both contained text message

exchanges between JD1 and defendant. In one text message, JD1 indicated that she was considering working with another person due to defendant's behavior. There were also threatening messages sent from defendant to JD1. Among other things, he told her, "I beat Bitches for doing dumb shit," "Tomorrow I will beat your ass," and "Bitch, I'll smack the shit out of you." Defendant's cell phones also contained threatening text messages sent to JD2 and JD3. In one of the messages to JD2, defendant said: "I'm gonna beat you up stay off the phone while you're with your client." He also texted JD3, "I hit girls."

Reddit.com

Based on recorded jail conversations involving defendant, a warrant was obtained to search an online discussion blog, Reddit.com, for posts and comments by a user named "Zaemai" on the board "PimpFeet." The name Zaemai was associated with a photograph of defendant found on one of his cell phones.

The search revealed that in March 2015, August 2015, and May 2016, the user named Zaemai posted comments on the board PimpFeet. In the March 2015 post, Zaemai stated that he was "new to pimping" and asked for advice on how to "better advertise for more upscale clients." He wrote, "I have one ho right now from Eastern Europe who is about 30. We are in Nor Cal, about an hour and a half from Frisco, and making less than $500 a day online. I told her we are not leaving town until she makes 1K per day for 10 straight days. I am trying to figure out how to better advertise for more upscale clients. Can you all help? If I can figure that out, I may even be able to get a couple more hos added to my stable." In response to advice he received, he stated, "We are in Nor Cal, not far from Cow Town. We don't dance at clubs or hang out in hotels. She wants to move to a better apartment. As soon as we can figure out how to obtain some better clients, high-class independent escorts is my vision."

In the August 2015 post, the user named Zaemai commented on a post titled, "Knocking Independent Hos." He indicated that he had a woman that was "turning five tricks a day from Backpage" but complained that she had no high-end clients, no car, and a "shitty home." He wrote, "She has been independent for two years because the last P told her a bunch of shit and nothing happened. I like her because she's not on drugs and she stays in the room all day for a measly $300. I'm trying to get some information on how to get her out of this situation."

Later that same day, the user named Zaemai commented on a post titled, "Lacing Her With Game." In his comment, he offered advice on how to avoid the police, advising that, "One way to avoid the police is to teach her not to talk about services over the telephone." He also advised that pimps should "[c]heck [their] local forum and read what independent providers are saying," explaining: "This site is more about clothes and cars pimps should try to catch bitches with as well as for passing on catch phrases and lingo to impress bitches. I've never seen any discussions on screening, booking travel

arrangements, encryption devices, and that sort of stuff pimps in 2015 should be aware of. There are few pimps who are aware human trafficking is a charge a lot of young brothers are being dealt. Nobody wants to talk about that issue because it's boring. I'm not a pimp, I'm here for the entertainment."

In the May 2016 post, the user named Zaemai indicated that he was working with several prostitutes but complained about the price of hotel rooms and asked for help in how to secure a private residence, explaining that: "The challenge is I only want to stay a couple of months and I may have to stack two to three chickens in the same place and the traffic and headaches are sure to increase." He later posted several comments about pimping, including: "Being a pimp is about finding what a bitch lacks in her life and meeting that need for her. Identify the needs of a bitch and fulfill them, then use that to your advantage and that's the day you'll be a pimp." He also said, "When pimping crosses real life, many of y'all don't know where to go.... If a bitch want to raise my seed, she married to game for life. I ain't changing for no ho bitch. The heart of a pimp is a cold thing.... A bitch with kid just received a ball and chain with no key. That bitch has checkmated every time. She can't go nowhere, but back to me. I'm not a pimp, I'm here for the entertainment." In another comment, he said, "I do know pimps are supposed to get bitches to fall in love with them and trust them. There are no rules to getting another person to fall in love. A pimp has gotta do what path a pimp is to do to build his stable.... I ain't no pimp, I am here for the entertainment. Your pimp."

Defendant's Testimony

Defendant testified on his own behalf at trial. He confirmed that he began texting with JD1 around early 2014, and that they exchanged messages for about a year before they met in person. At that time, he was living in Sacramento. Defendant explained that he started exchanging messages with JD1 after he saw her advertisement on MyRedBook.com. He claimed that he wanted to date her and that he did not know the Web site was commonly used to advertise prostitution services.

After defendant met JD1 in person, she asked him if he was familiar with Backpage.com and posting advertisements on that Web site. She explained that another person had set up her Backpage.com account and that she did not know how to post advertisements online. Defendant claimed that he did not know anything about the Web site but agreed to take a look at it and get back to her. After doing some research, he agreed to post advertisements for her if she paid the posting fee. When asked, defendant could not recall ever having a conversation with JD1 about exchanging sex for money.

Defendant explained that he primarily used JD1's premium Backpage.com account, nottierose@xxxxx.com, for his postings on that Web site. He posted an advertisement for himself, offering his services as an assistant in various services, including marketing, creating profiles and Web pages, making travel arrangements, and screening clients. He acknowledged that he also posted

advertisements for some of the women involved in this case. However, he claimed that the advertisements were not for prostitution activities. Rather, the advertisements he posted were for services that did not involve sexual acts (e.g., modeling, dancing, massages, body blotting). He insisted that he never encouraged the women to engage in prostitution activities with clients and claimed that he did not know exactly what the women did with clients. He also claimed that he did not use any nudity in his postings and did not advertise any services for money, although he bragged about his skill in posting advertisements and said that every person he posted for told him they made more money with his advertisements.[3] According to defendant, the women he worked with had access to their advertisements, had seen them, and could delete them if they wanted to. He noted that JD1, JD5, JD8, JD9, and JD11 posted online advertisements for themselves and other women using JD1's Backpage.com account.

As for JD1, defendant explained that she was experienced in the "industry," and that she dated other men while they dated. She told him what cities they should travel to and where they should stay. He claimed that she worked with other men who posted advertisements for her, and that he did not care that she worked with these men. When asked, he said that he never forced her to travel without their daughter.

As for JD2, defendant explained that they agreed to start a business relationship after she responded to his Backpage.com advertisement. He claimed that their business relationship did not involve him arranging for her to have sex with other men in exchange for money. Rather, he agreed to fix and repost her advertisement on Backpage.com, and told her she would have to pay him about half of her earnings to cover advertisement fees, hotel costs, and transportation expenses. He admitted that he had access to her bank account and that he used her bank card to make hotel reservations in her name. When asked, he explained that he took JD2 and JD5 with him to Seattle in February 2017 for seven to 10 days. He stayed with family while they stayed in hotel rooms he booked for them.

As for JD3, defendant explained that he met her in March 2016 through one of her friends who was already working with him—JD6. Thereafter, they entered into a similar business relationship that he had with JD2, except that he estimated JD3's expenses would be about 30 percent of her earnings because she was only 18 years old and needed to share a hotel room with other women for safety reasons.

As for JD4 through JD12, defendant admitted that he posted advertisements for JD5, JD8, JD9, and JD12, but denied or did not

---

[3] "The postings indicated that 'services' could be obtained in exchange for 'donations.' Some of the postings stated that 15 minutes of service equals 60 roses. Defendant acknowledged that 'roses' meant the amount of money the services would cost, explaining that Backpage.com did not allow advertisements to specify how much money services cost." Campbell, 51 Cal. App. 5th at 477 n. 8.

remember posting advertisements for JD4, JD6, JD10, and JD11. He claimed that he was not the primary person who responded to clients asking for services from the women he worked with. Rather, he only replied and communicated with clients if the women asked him to, or when he first started working with them. He further explained that all of the women who worked with him shared a hotel room at some point, and that he did not force them to do anything. He noted that his financial arrangement with each woman was different; the amount they paid him depended on their expenses. According to defendant, the women did not work for him but rather he worked with them. He was just their assistant.

Defendant denied beating any of the women involved in this case but admitted to smacking JD1's head once and "popp[ing]" her in the face once. He also admitted that he hit his daughter once, and that he pushed JD2 one time and sent text messages to JD1, JD2, and JD3 threatening to hit them. He explained that he threatened to beat JD2 because she was texting while on a date with a client. He further explained that he threatened to beat JD1 because she texted negative things all day and called him a "stupid, dumb nigger."

Defendant admitted that he linked JD1's, JD2's, and JD3's phone numbers to his Google Voice account but claimed that he did not set up dates for them on his own, explaining that he only responded to messages from clients when the women requested his assistance. He maintained that he did not provide condoms or drugs to any of the women who worked with him. When asked about the numerous condoms found in his car by the Galt police officer, he claimed the condoms belonged to him, explaining that he had many girlfriends.

Although he was aware that the owner of Backpage.com was arrested on prostitution charges, defendant admitted that he continued to post advertisements on that Web site. He also admitted that he observed men come to the hotel rooms occupied by the women in this case and stay for a short period of time, and that he collected money from the women to pay for online advertising and other costs associated with their working relationship. However, he insisted that he did not know exactly what the women did for the money they received. He made this claim after he was confronted with evidence of two text messages he sent to JD1, which said: "You need your ass kicked because it's wrong to have the baby in front of a client having sex," and "You're looking for a guy that follows you around while you fuck whoever, but want some for money and others don't have to pay." Defendant did not deny sending these messages. Instead, he explained that the messages were meant to be hurtful.

Defendant denied posting any comments to the PimpFeet board on Redditt.com, explaining that the e-mail account associated with the postings (zaemai@xxxxx.com) was a "group account" accessible by several other people and that one of those people must have made the postings.

People v. Campbell, 51 Cal. App. 5th 463, 469-79 (2020) (some footnotes omitted).

////

10

1    On June 19, 2018, a jury found petitioner guilty of three counts of pimping and eleven

2    counts of pandering.[4] (ECF No. 34-9 at 198-203.) On October 31, 2018, petitioner was sentenced

3    to an aggregate term of 19 years and 4 months in state prison. (Id.)

4    Petitioner timely appealed his convictions. On June 29, 2020, the California Court of

5    Appeal for the Third Appellate District rejected petitioner's claims on appeal and affirmed the

6    judgment. Campbell, 51 Cal. App. 5th 463. Petitioner sought review in the California Supreme

7    Court. (ECF No. 34-17.) The California Supreme Court summarily denied review on September

8    16, 2020. (ECF No. 34-18.)

9    Petitioner initiated the present federal action in December of 2021. (ECF No. 1.) The case

10    was stayed for the purpose of petitioner exhausting Claim Six, which was not included in the

11    petition for review. (See ECF Nos. 28, 33.) Petitioner filed a notice of exhaustion on July 28,

12    2023. (ECF No. 33.) Respondent has answered the petition. (ECF No. 37.)

13    **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

14    An application for a writ of habeas corpus by a person in custody under a judgment of a

15    state court can be granted only for violations of the Constitution or laws of the United States. 28

16    U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or

17    application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

18    U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

19    Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

20    corpus relief:

21    
22    An application for a writ of habeas corpus on behalf of a person in
      custody pursuant to the judgment of a State court shall not be granted
      with respect to any claim that was adjudicated on the merits in State

23    court proceedings unless the adjudication of the claim –

24    (1) resulted in a decision that was contrary to, or involved an
      unreasonable application of, clearly established Federal law, as
      determined by the Supreme Court of the United States; or

25    
26    
27    
_____

28    [4] The jury found petitioner not guilty on human trafficking counts charged as to JD1, JD2, and
      JD3, and not guilty on a pandering count involving JD12. Campbell, 51 Cal. App. 5th at 479-80.

11

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not enough

12

that a federal habeas court, in its independent review of the legal question, is left with a firm

conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

must show that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693

F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not

supported by substantial evidence in the state court record" or he may "challenge the fact-finding

process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox,

366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.

2014) (If a state court makes factual findings without an opportunity for the petitioner to present

evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel,

applying the normal standards of appellate review," could reasonably conclude that the finding is

supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the

federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943,

972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not

automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may

make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459

F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc). For claims upon which a petitioner seeks to present evidence, the petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

This court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

////

////

////

14

**ANALYSIS**

**I.      Instruction with CALCRIM No. 1151 (Claims One and Two)**

California law sets forth six ways a person may be guilty of pandering, including when a person does either of the following:

> (1) Procures another person for the purpose of prostitution.
>
> (2) By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute.

Cal. Penal Code § 266i.

At the close of petitioner's trial, the jury was instructed on pandering with CALCRIM No. 1151 as follows:

> The defendant is charged in [Counts 3, 6, and 9-18] with pandering, in violation of Penal Code Section 266i.
>
> To prove that the defendant is guilty of pandering, the People must prove that:
>
> 1. The defendant successfully persuaded/procured a Jane Doe to become a prostitute, or the defendant used promises or any device or scheme to cause/persuade/encourage/induce a Jane Doe to become a prostitute, or the defendant used fraud or trickery to persuade/procure a Jane Doe ... to be a prostitute.
>
> AND
>
> 2. The defendant intended to influence a Jane Doe to be a prostitute.
>
> It does not matter whether a Jane Doe was a prostitute already.
>
> A prostitute is a person who engages in sexual intercourse or any lewd act with another person in exchange for money. Pandering requires that an intended act of prostitution be with someone other than the defendant. A lewd act means physical contact of the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal and gratification.

(ECF No. 34-8 at 170.)

In Claim One, petitioner argues his federal constitutional rights were violated by the instruction stating it did not matter that a Jane Doe was already a prostitute. (ECF No. 1 at 20-31.) He argues the error deprived him of a fair trial and his opportunity to present a meaningful defense because his defense was that he lacked the specific intent for pandering. (Id. at 23-24.)

15

1    In Claim Two, petitioner argues his federal constitutional rights were violated by the

2    instruction that he was guilty of pandering if he successfully persuaded/procured a Jane Doe to

3    become a prostitute. (ECF No. 1 at 32.). Petitioner argues the instruction did not accurately sate

4    the requirements of Penal Code section 266i because it eliminated the means required for

5    persuasion which is an essential element. (Id. at 32-33.) He argues the instruction allowed

6    conviction if he unintentionally persuaded another person to become a prostitute and therefore did

7    not require the prosecution to prove every element of the offense. (Id. at 34-38.)

8    In the last reasoned state court opinion on Claims One and Two, the California Court of

9    Appeal rejected both contentions:

> We reject defendant's initial contention that the CALCRIM No. 1151
> instruction given to the jury eliminated an essential element of the
> crime of pandering because it allowed the jury to convict him of
> pandering based on a finding that he "persuaded/procured a Jane Doe
> to become a prostitute," without the additional finding that he did so
> by promises, threats, violence, or by any device or scheme, as
> required by subdivision (a)(2) of section 266i. [....]
>
> [S]ubdivision (a) of section 266i has six parts that "'define the
> different circumstances under which the crime of pandering may be
> committed.'" (Leonard, supra, 228 Cal.App.4th at p. 490, 175
> Cal.Rptr.3d 300.) The commission of any one of the acts described
> in subdivision (a) constitutes the offense of pandering. [....]
>
> [....] Contrary to defendant's contention, the first alternative [of the
> instruction given], which pertains to criminal liability under section
> 266i, subdivision (a)(1), did not eliminate an essential element of the
> offense by allowing the jury to convict him on a theory of pandering
> by persuasion without a finding that he "used promises or any device
> or scheme" to persuade a Jane Doe to become a prostitute. As a panel
> of this court recently explained, to establish a violation of section
> 266i, subdivision (a)(1), the prosecution need not prove the
> additional element of the second alternative (i.e., "'promises, threats,
> violence, or any device or scheme'"), which pertains to criminal
> liability under section 266i, subdivision (a)(2). (People v. Chatman
> (2019) 30 Cal.App.5th 989, 994, 242 Cal.Rptr.3d 138 (Chatman).)
>
> To the extent defendant's claim of error rests on the premise that the
> term "procure" as used in the pandering statute cannot be construed
> to mean "persuade" another person to become a prostitute, we find
> that it lacks merit. Again, we point out that long-standing case law
> has construed the term "procure" in the context of the pandering
> statute to mean assisting, inducing, persuading or encouraging a
> person to engage in prostitution. (Montgomery, supra, 47 Cal.App.2d
> at p. 12, 117 P.2d 437 [noting that the "alternatives recited in the
> statute are plainly not all mutually exclusive of each other"]; Schultz,
> supra, 238 Cal.App.2d at p. 812, 48 Cal.Rptr. 328.) Such a

16

construction is consistent with the purpose and intent of the pandering statute, which our Supreme Court has explained is to criminalize the knowing and purposeful conduct of any person seeking to persuade, encourage, or otherwise influence the target to become a prostitute. (Zambia, supra, 51 Cal.4th at p. 980, 127 Cal.Rptr.3d 662, 254 P.3d 965; see id. at p. 973, 127 Cal.Rptr.3d 662, 254 P.3d 965 [….] Moreover, as noted, the Legislature's numerous amendments to the pandering statute since Montgomery and Schultz, without altering the judicial construction of the term "procure," gives rise to the presumption that the Legislature has acquiesced in and ratified the judicial interpretation of the statute. (Zambia, at pp. 975-976, 127 Cal.Rptr.3d 662, 254 P.3d 965.)

We also reject defendant's contention that the trial court erroneously instructed the jury with the following language of CALCRIM No. 1151: "It does not matter whether a Jane Doe was a prostitute already." In Zambia, our Supreme Court concluded that each of the six parts of section 266i, subdivision (a) apply when the victim is already an active prostitute, explaining that the plain intent and purpose behind all the parts of the pandering statute is to "deter pimps or others from establishing new working relationships in the unlawful prostitution trade." (Zambia, supra, 51 Cal.4th at pp. 977-978, 127 Cal.Rptr.3d 662, 254 P.3d 965; see Chatman, supra, 30 Cal.App.5th at p. 996, 242 Cal.Rptr.3d 138 ["The caveat the court gave the jurors correctly emphasized that the fact [Jane Doe] was already a prostitute did not matter."].)

Campbell, 51 Cal. App. 5th at 495-96.

Fundamentally, petitioner's Claim One and Claim Two both argue the state court erred in its application of state law on pandering. These claims challenging the jury instruction given on pandering do not state a federal constitutional claim. See Engle v. Isaac, 456 U.S. 107, 119 (1982) (simply challenging the correctness of the instructions under state law does not allege deprivation of federal rights for habeas relief). The state court's interpretation of state law binds this federal habeas court. See Bradshaw v. Richey, 546 U.S. 74, 77 (2005). This includes petitioner's argument regarding the means used for persuasion, which under state law is not an essential element for the crime of pandering. Campbell, 51 Cal. App. 5th at 495.

To warrant federal habeas relief, a challenged instruction cannot be "merely... undesirable, erroneous, or even 'universally condemned,'" "but must violate some due process right guaranteed by the Fourteenth Amendment. Cupp v. Naughten, 414 U.S. 141, 146 (1973). Petitioner's general appeals to due process, a fair trial, and right to present a meaningful defense in Claims One and Two do not transform these state law jury instructional error claims into federal claims. See

17

Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner "may not… transform a state-law issue into a federal one merely by asserting a violation of due process").

The court rejects petitioner's argument in Claim Two that the challenged instruction prevented the jury from considering evidence of his intent. To the contrary, the jury was instructed petitioner could only be convicted if "[t]he defendant intended to influence a Jane Doe to be a prostitute." (ECF No. 34-8 at 170.) The instruction did not prevent petitioner from presenting his defense that he lacked the necessary specific intent for pandering. Petitioner presented this defense through his testimony, but the jury did not believe it.

Setting aside petitioner's assertion that he was prevented from presenting a defense and the general appeals to federal rights, Claims One and Two merely dispute the state court's construction of Penal Code section 266i, including its applicability when the pandering subject is an active prostitute. These claims premised on challenges to California law do not implicate petitioner's due process right guaranteed by the Fourteenth Amendment. The state court's rejection of these claims based on state law was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## II.    Void for Vagueness (Claim Three)

Petitioner claims Penal Code section 266i(a)(1) is unconstitutionally vague because the term "procure" is undefined and includes non-criminal acts. (ECF No. 1 at 44.) He argues the pandering statute failed to give him notice that posting an escort ad or providing other technical-related escort assistance could violate the statute. (Id. at 45-49.)

In the last reasoned state court opinion on this claim, the California Court of Appeal held on direct appeal, in relevant part:

> We conclude that defendant's constitutional challenge to the pandering statute is without merit. A similar challenge was rejected nearly 45 years ago in People v. Hashimoto (1976) 54 Cal.App.3d 862, 126 Cal.Rptr. 848 (Hashimoto). In that case, the appellate court explained that section 266i is "designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes." (Hashimoto, at p. 867, 126 Cal.Rptr. 848.) The court concluded that the language of section 266i is not vague, reasoning: "It is not reasonably susceptible of being interpreted to cover any activity beyond that involved in the social evil of

18

pandering. [Citation.] The terms 'procuring, persuading and encouraging' are all words capable of precise definition. [Citations.] [¶] The test is whether the conduct of the defendant meets the commonly accepted definitions of the words used in the statute." (Hashimoto, at p. 867, 126 Cal.Rptr. 848.) We agree with the reasoning of Hashimoto.

The fact that section 266i does not define the term "procure" does not render the statute unconstitutionally vague. The language of the statute is sufficiently clear and settled to provide fair notice of the proscribed conduct. Indeed, long-standing case law in effect at the time of defendant's offenses provided adequate guidance as to what the term "procure" means in the context of pandering. Since 1941, case law has construed the term to mean assisting, inducing, persuading or encouraging a person to engage in prostitution. (Montgomery, supra, 47 Cal.App.2d at p. 12, 117 P.2d 437.) [….] Our appellate courts have long recognized that California's pandering statute "'cover[s] all the various ramifications of the social evil of pandering and include[s] them all in the definition of the crime, with a view of effectively combating the evil sought to be condemned.'"'" (Zambia, at p. 978, 127 Cal.Rptr.3d 662, 254 P.3d 965.) Accordingly, we conclude defendant had fair notice of what was proscribed under section 266i, subdivision (a)(1) at the time of his offenses.

Campbell, 51 Cal. App. 5th at 491-92.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, (1983). In a vagueness challenge brought under the Due Process Clause of the Fourteenth Amendment, a court looks to the plain language of the statute as well as to state courts' interpretations of the statute. Nunez v. City of San Diego, 114 F.3d 935, 941-42 (9th Cir. 1997) (citing Kolender, 461 U.S. at 355 n. 4). A statute will meet the certainty requirement of the Constitution if its language conveys sufficiently definite warning as to the proscribed conduct, as measured by common understanding and practices. Panther v. Hames, 991 F.2d 576, 578 (9th Cir. 1993); see also United States v. Petrillo, 332 U.S. 1, 8 (1947) (the Constitution requires only that a law "convey[ ] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices").

As the state appellate court explained, California courts have for a long time construed "procure" as it is used in the pandering statute to mean assisting, inducing, persuading or

1    encouraging a person to engage in prostitution. <u>Campbell</u>, 51 Cal. App. 5th at 492. Petitioner

2    takes issue with the state court's construction of the term based on use of that word beginning

3    more than 80 years ago.[5] (ECF No. 1 at 45.) Petitioner does not, however, assert that common

4    understanding of the meaning of the word has changed or otherwise explain why that is

5    objectionable.

6         The Merriam Webster dictionary includes in the definition for "procure" the following

7    definition: "to obtain (someone) to be employed for sex (as for an individual or in a brothel)." <u>See</u>

8    www.merriam webster.com/dictionary/procure. When a term has a well-settled common

9    meaning, as here, it will not violate due process simply because there may be "an element of

10   degree in the definition as to which estimates might differ." <u>Panther</u>, 991 F.2d at 578 (quoting

11   <u>Connally v. General Construction Co.</u>, 269 U.S. 385, 391 (1926)).

12        The pandering statute prohibited petitioner from "procur[ing] another person for the

13   purpose of prostitution" and from "encourag[ing] another person to become a prostitute" by any

14   device or scheme. Cal. Penal Code § 266i(a)(1)-(2). Petitioner argues throughout the petition that

15   the pandering counts related to the non-testifying Jane Doe defendants were based on the posting

16   of escort ads and providing related technical assistance. (ECF No. 1 at 48.) Additionally, though,

17   the jury credited extensive evidence detailed by the state court showing that his assistance to the

18   Jane Does was for the purpose of prostitution, which he knew to be the case. This evidence

19   included but was not limited to petitioner's cell phone records, his comments made in online

20   discussion blogs, testimony from JD1, JD2, and JD3, and evidence that he designed ads for and

21   transported and booked hotel rooms for some of the non-testifying Jane Does. A person of

22   ordinary intelligence would have understood the language of Penal Code § 266i prohibited

23   engaging in the business of posting escort ads and providing related technical assistance for the

24   purpose of prostitution. Petitioner had fair warning that his conduct was prohibited. The state

25   court reasonably concluded the pandering statute is not unconstitutionally vague and did not

26   unreasonably apply clearly established Supreme Court precedent.

27   _____

28   [5] This argument contradicts petitioner's vague and unsupported assertion in the heading of this
     claim that the state court enlarged the statute and applied it retroactively.

1    **III.    Sufficiency of the Evidence for Pandering (Claim Four)**

2    Petitioner claims there was insufficient evidence for the jury to find him guilty of

3    pandering by procuring as to the Jane Doe victims who did not testify. (ECF No. 1 at 57-70.) He

4    argues the prosecution failed to prove "success," i.e., that each Jane Doe actually engaged in

5    prostitution as a result of any act of assistance by petitioner and also failed to prove he used

6    promises, any device or scheme, fraud or trickery to persuade or encourage the non-testifying

7    Jane Does to become prostitutes. (Id. at 58-61.) Instead, petitioner argues, there was no direct

8    evidence that any non-testifying Jane Doe engaged in an act of prostitution with anyone

9    responding to the ads. (Id. at 65.) Petitioner argues the evidence showed he intentionally

10   identified escorts, created escort ads for them which did not contain any illegal content, and used

11   these ads and other services to secure business from them because he profited from buying and

12   selling the bitcoins used to buy the ads. (Id. at 60-64.) Petitioner argues there was no direct

13   evidence he recruited JD4 through JD11 to engage in prostitution activities. (Id. at 60, 67-68.)

14   In the last reasoned state court opinion on this claim, the California Court of Appeal held

15   on direct appeal, in relevant part:

16
17   Viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence from which a reasonable jury could have concluded defendant was guilty on counts 10 through 17, which charged him with pandering involving JD4 through JD11.

18
19   At the outset, we pause to note that defendant does not challenge the sufficiency of the evidence with respect to his pandering convictions involving JD1, JD2, or JD3. And with good reason. As set forth above, those witnesses testified in detail about how defendant assisted and encouraged them to engage in prostitution activities in exchange for a share of their earnings. Their testimony was corroborated by the sting operation, defendant's testimony, evidence discovered during electronic searches (including cell phones), and searches of defendant's person and car. We reject defendant's contention that there was insufficient evidence to support the pandering convictions as to JD4 through JD11 because they did not testify, and therefore there was no substantial evidence establishing that he "affirmatively influenced" any of these women "to become or be a prostitute." On this record, there was sufficient evidence from which a reasonable jury could infer that defendant was guilty of pandering involving JD4 through JD11.

20
21
22
23
24
25
26
27   Collectively, the testimony of JD1, JD2, and JD3 showed that defendant worked with JD4 through JD11, and that the "work" the women engaged in was prostitution activities. There was also

28

21

1    evidence that defendant knowingly assisted and encouraged JD4
      through JD11 to engage in such activities. Among other things, the
2    evidence showed that he posted online advertisements for each of
      these women to perform "services," which contained images of them
3    barely clothed and posed in provocative positions. Some of the
      images contained nudity. The evidence also showed that defendant
4    booked hotel rooms for JD5 and JD7 through JD11. In addition, there
      was evidence—the postings on Reddit.com—from which a
5    reasonable jury could have concluded that defendant admitted to
      being a pimp who assisted and encouraged the women he worked
6    with to engage in prostitution activities. When defendant testified, he
      admitted that he posted advertisements for some of the nontestifying
7    Jane Does, including posting advertisements on Backpage.com,
      which was a Web site commonly used to advertise for prostitution
8    activities.

9    In view of the record, we conclude substantial evidence supports the
      pandering convictions on counts 10 through 17 involving JD4
10   through JD11. A reasonable jury could have found the essential
      elements of the crime as to each woman beyond a reasonable doubt.
11   The evidence established that defendant was in the business of
      recruiting prostitutes, finding a place of business for them (hotels),
12   and soliciting customers for them. Substantial evidence supports the
      jury's conclusion that JD4 through JD11 were part of that business.

13

14   Campbell, 51 Cal. App. 5th at 487-88.

15        The Due Process Clause "protects the accused against conviction except upon proof

16   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

17   charged." In re Winship, 397 U.S. 358, 364 (1970). For a challenge to the sufficiency of the

18   evidence, the court reviews the evidence in the light most favorable to the prosecution and

19   determines whether "any rational trier of fact could have found the essential elements of the crime

20   beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). A federal court may

21   only grant habeas relief upon finding the state court decision rejecting the claim was an

22   objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo v.

23   Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011).

24        The trial evidence viewed in the light most favorable to the jury's verdict contains ample

25   evidence to support petitioner's pandering convictions pertaining to the non-testifying Jane Does.

26   Circumstantial evidence sufficiently supports a conviction so long as there is a "plausible chain of

27   logic to support the jury's verdict." United States v. Del Toro-Barboza, 673 F.3d 1136, 1145 (9th

28   Cir. 2012). Although JD4 through JD11 did not themselves testify, substantial other evidence

showed that petitioner took actions to solicit customers for them. He also transported some Jane Does and secured hotel rooms for them. Considering the texts and comments petitioner made in online discussion blogs, the contents of his car, the testimony from JD1, JD2, and JD3, the content of ads he created and posted for the Jane Does, and common sense, the jury reasonably rejected his testimony that he did not know what the Jane Does did in the hotels rooms with their clients.

Moreover, petitioner's claim is foreclosed by California law to the extent he asserts insufficient evidence supports his convictions because (1) the prosecution did not show successfully completed acts of prostitution and (2) the Jane Does were already prostitutes. The state court explained on direct appeal that the crime of pandering comprises a "broad range of conduct" involving "the business of recruiting a prostitute, finding a place of business for a prostitute, or soliciting customers for a prostitute." Campbell, 51 Cal. App. 5th at 484. The statute "places the focus on the defendant's unlawful actions and intent," rather than focusing on the victim. Id. at 486.

California law is clear that the specific intent for pandering can be established when a defendant assists a person who has already decided to become a prostitute. Campbell, 51 Cal. App. 5th at 486 ("Our Supreme Court has held that causing, inducing, persuading or encouraging someone to 'become a prostitute' under this statute includes… behavior directed at 'someone who is already an active prostitute.'"). In addition, "[t]he crime of pandering does not require that actual acts of prostitution take place." Id. at 488; see also id. at 486 n. 19 ("There is no requirement that defendant succeed [at encouraging another person to become a prostitute].""). The state court's interpretation of state law on these points binds this federal habeas court. See Bradshaw, 546 U.S. at 76.

Given the evidence at trial, the state appellate court reasonably determined a rational jury could find petitioner guilty of pandering beyond a reasonable doubt in the counts of conviction corresponding to the non-testifying Jane Does. Petitioner fails to demonstrate the state appellate court unreasonably denied relief on this claim.

////

23

**IV.    Ineffective Assistance of Counsel (Claim Five)**

Petitioner claims trial counsel rendered ineffective assistance in failing to object to testimony from JD1 through JD3 about the activities of nontestifying Jane Does, including, specifically, that they engaged in sexual acts in exchange for money. (ECF No. 1 at 71-84.) He argues they testified in conclusory manner and did not explain how they had personal knowledge the other Jane Does were prostitutes. (<u>Id.</u> at 72.) Petitioner asserts counsel deficiently failed to object based on lack of foundation and hearsay. (<u>Id.</u> at 73.)

In the last reasoned state court opinion on this claim, the California Court of Appeal held on direct appeal, in relevant part:

> We conclude defendant has failed to establish ineffective assistance of counsel. Defendant has not carried his burden to show deficient performance. He has failed to demonstrate that the unasserted evidentiary objections would have been sustained. Defense counsel cannot be considered ineffective for failing to make groundless objections. (<u>People v. Boyette</u> (2002) 29 Cal.4th 381, 437, 127 Cal.Rptr.2d 544, 58 P.3d 391.) But even assuming the unasserted objections had merit, there is no affirmative explanation in the record for counsel's failure to object to the challenged testimony, and defendant has made no effort to meet his burden to show there is no satisfactory explanation for counsel's inaction. Competent counsel may forgo even a valid objection for tactical reasons. (<u>People v. Slaughter</u> (2002) 27 Cal.4th 1187, 1210, 120 Cal.Rptr.2d 477, 47 P.3d 262, abrogated on other grounds in <u>People v. Diaz</u> (2015) 60 Cal.4th 1176, 1190-1191, 185 Cal.Rptr.3d 431, 345 P.3d 62.) For example, defense counsel may forgo an objection to avoid highlighting testimony to the jury (<u>People v. Wharton, supra</u>, 53 Cal.3d at p. 567, 280 Cal.Rptr. 631, 809 P.2d 290), or to avoid causing a prosecutor to establish a more compelling foundation for the admission of the contested testimony (<u>People v. Dennis</u> (1998) 17 Cal.4th 468, 532, 71 Cal.Rptr.2d 680, 950 P.2d 1035).
>
> We can conceive of more than one strategic reason for trial counsel's failure to object to the challenged testimony. Counsel may have concluded that JD1, JD2, and JD3 had additional personal knowledge about the other Jane Does working with defendant and did not want the prosecutor to elicit that information. Under the circumstances, competent counsel could have determined that the risk of hearing more details relating to how they knew the other women engaged in prostitution activities was not worth the reward of a successful objection. Alternatively, had the court sustained objections to the challenged testimony, the prosecution could have sought to introduce additional evidence, including testimony from the other Jane Does. Competent counsel could have concluded that the testimony given by JD1, JD2, and JD3 was preferable to the prosecution calling the other Jane Does to testify or the prosecutor presenting other evidence showing the prostitution activities of the Jane Does.

24

1
2
3
4
5
6
7

> In addition to failing to show deficient performance, defendant has failed to carry his burden to demonstrate that he suffered prejudice as a result of trial counsel's failure to object. There was independent evidence showing that defendant worked with the Jane Does implicated by his ineffective assistance claim. There was also strong evidence supporting the conclusion that the women he worked with engaged in prostitution activities, and that he received a share of their earnings in return for his assistance in helping them engage in those activities, including posting advertisements, setting up dates, booking hotels, and providing transportation. In other words, there is ample independent evidence in the record supporting his pandering convictions with respect to JD4 through JD11.

8    Campbell, 51 Cal. App. 5th 463 at 505-06.

9    To demonstrate a denial of the Sixth Amendment right to the effective assistance of

10   counsel, petitioner must establish that counsel's performance fell below an objective standard of

11   reasonableness, and that he suffered prejudice from the deficient performance. Strickland v.

12   Washington, 466 U.S. 668, 690 (1984). Deficient performance requires a showing that counsel's

13   performance was "outside the wide range of professionally competent assistance." Id. at 687 &

14   697. Prejudice is found where there is a reasonable probability that, but for counsel's

15   unprofessional errors, the result of the proceeding would have been different. Id.

16   "Surmounting Strickland's high bar is never an easy task," and review under the AEDPA

17   is doubly deferential. Richter, 562 U.S. at 105. "[T]he pivotal question" for a federal court

18   conducting habeas corpus review under section 2254(d) "is whether the state court's application

19   of the Strickland standard was unreasonable," which "is different from asking whether defense

20   counsel's performance fell below Strickland's standards." Richter, 562 U.S. at 101. The

21   determination to be made is not whether counsel acted reasonably but "whether there is any

22   reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 105.

23   Here, the state court reasonably rejected petitioner's ineffective assistance claim premised

24   on the alleged failure of counsel to object to Jane Doe testimony as hearsay and for lack of

25   foundation regarding the activities of nontestifying Jane Does, including that they engaged in

26   prostitution. As the state court explained, competent counsel could have concluded that foregoing

27   objection was preferable to risking having the prosecution present other, more objectionable

28   evidence to prove the prostitution activities of the Jane Does. This by itself constitutes a

1    "reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard" in not making the

2    objections at issue. <u>Richter</u>, 562 U.S. at 105.

3         The state court also reasonably concluded petitioner could not demonstrate prejudice for

4    his ineffective assistance claim. The Jane Does who testified explained the services petitioner

5    provided to them for the purpose of prostitution. There was ample evidence that he was in the

6    business of working with prostitutes and that he provided those services for the non-testifying

7    Jane Does. It is not reasonably likely that absent the claimed error, the result of the proceeding

8    would have been different. Accordingly, petitioner fails to show the state court unreasonably

9    applied the <u>Strickland</u> standard.

10   **V.       Jury Instructions on Prior Acts of Domestic Violence (Claim Six)**

11        Petitioner claims the trial court erred in instructing the jury that evidence of prior

12   misdemeanor domestic misconduct could be considered in determining his credibility. (ECF No.

13   1 at 85-113.) On direct appeal, the state appellate court set forth additional background relevant to

14   this claim as follows:

15-16
> The amended information charged defendant with three counts of human trafficking in violation of section 236.1, subdivision (b). [….]

17-21
> [T]he prosecutor filed a motion pursuant to Evidence Code sections 1101 and 1109 requesting permission to admit evidence of defendant's prior acts of domestic violence involving three of his former girlfriends for the purpose of proving his character for violence and his criminal intent with respect to the human trafficking offenses. The trial court ruled that the prior acts evidence was admissible for these purposes. There was no discussion as to whether the prior acts evidence would be admissible as impeachment evidence if defendant testified.

22-28
> At the close of trial, the jury was instructed pursuant to CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.) and CALCRIM No. 852 (Evidence of Uncharged Domestic Violence). The jury was instructed that it could consider the uncharged acts of domestic violence in deciding whether defendant acted with the requisite intent for the human trafficking offenses and in assessing his credibility as a witness. The jury was also instructed with CALCRIM No. 316 (Additional Instructions on Witness Credibility—Other Conduct), which as given here stated, in relevant part: "If you find that a witness has committed a crime or other misconduct, you may consider that fact [only] in evaluating the credibility of the witness'[s] testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness'[s] credibility. It is up to you to decide

26

> the weight of the fact and whether that fact makes the witness less believable."
>
> As previously indicated, the jury found defendant guilty on 11 counts of pandering involving JD1 through JD11 and three counts of pimping involving JD1, JD2, and JD3. He was found not guilty on the pandering count involving JD12 and the human trafficking counts involving JD1, JD2, and JD3.

Campbell, 51 Cal. App. 5th at 497-98 (footnotes omitted).

The state appellate court held petitioner forfeited his claim of instructional error by failing to object at trial. Campbell, 51 Cal. App. 5th at 499. Despite finding forfeiture, the state appellate court alternately reviewed the evidence and found it was "not reasonably probable [petitioner] would have obtained a more favorable result absent the alleged instructional errors." Id. at 500. Given the lack of objection at trial, respondent asserts this claim is procedurally barred. (ECF No. 27 at 34-35.)

The procedural default doctrine forecloses federal review of a state prisoner's federal habeas claim that was defaulted in state court pursuant to an independent and adequate state procedural rule. See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). Generally, "federal habeas relief will be unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds,'" Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Coleman, 501 U.S. at 729-30).

The Ninth Circuit has repeatedly held that California's contemporaneous objection rule constitutes an independent and adequate ground precluding federal habeas review. See, e.g., Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (instructional error claim found barred by California's contemporaneous objection rule). Moreover, the state court's alternate ruling on the merits of a federal claim does not affect this court's procedural bar analysis because the state court explicitly invoked the rule as a separate basis for decision. See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989).

Petitioner does not challenge the independence or adequacy of California's contemporaneous objection rule. See Bennett, 322 F.3d at 585-86 (adopting a burden shifting

approach to reviewing procedural default issues under which the petitioner has the burden to show inadequacy once the state pleads the existence of an independent and adequate state procedural ground). Petitioner did not file a Traverse and has not addressed respondent's procedural default argument.

To pass over the procedural default hurdle, petitioner would need to show cause for his default and actual prejudice from the alleged error, or that failure to consider the claim will result in a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750; Martinez-Villareal v. Lewis, 80 F.3d 1301, 1305 (9th Cir. 1996). The cause standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to construct or raise the claim." McCleskey v. Zant, 499 U.S. 467, 493 (1991) (internal quotations omitted). To establish a "fundamental miscarriage of justice," a petitioner must demonstrate "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995).

Cause and prejudice with respect to petitioner's procedural default does not appear in the record. Petitioner fails to show that a failure to consider the claim will result in a fundamental miscarriage of justice. Claim Six is procedurally barred. See Paulino, 371 F.3d at 1093.

Even if petitioner had not procedurally defaulted this claim, he would not be entitled to relief. Where a habeas claim rests on an alleged constitutional error arising from a jury instruction, the question is whether an alleged instructional error, viewed in the context of the overall charge, "by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 70-71, (quoting Cupp, 414 U.S. at 147). Where instructional error is found to rise to the level of a constitutional violation under this standard, federal habeas relief is unavailable unless "the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Calderon v. Coleman, 525 U.S. 141, 147 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

At petitioner's trial, the jury was instructed it could consider the prior uncharged acts of domestic violence if it found, by a preponderance of the evidence, that petitioner committed those acts. Campbell, 51 Cal. App. 5th at 499. As to the pandering counts, the jury was instructed it

28

1   could, but was not required to, consider those acts for the limited purpose of determining

2   petitioner's credibility as a witness. Id. The jury was further instructed that his commission of

3   other misconduct (i.e., the prior uncharged acts of domestic violence) does not necessarily destroy

4   or impair credibility, and that it was for the jury to decide the weight to be given to the evidence

5   and whether it made him less believable. Id.

6       Instruction that the jury could optionally consider evidence of uncharged acts of domestic

7   violence when determining petitioner's credibility did not render his trial fundamentally unfair.

8   See Estelle, 502 U.S. at 70-71. The Supreme Court has never held that admission of overtly

9   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

10  See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see also Garceau v. Woodford,

11  275 F.3d 769, 774 (9th Cir. 2001) (explaining the Supreme Court has never expressly held that it

12  violates due process to admit other crimes evidence for the purpose of showing conduct in

13  conformity therewith, or for other purposes without a limiting instruction) (overruled on other

14  grounds). Thus, the right asserted by petitioner has not been clearly established by the Supreme

15  Court. This claim fails on the merits even if it were not procedurally defaulted. See, e.g., Mejia v.

16  Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (under AEDPA, the asserted right be clearly

17  established by the Supreme Court).

18                          **CONCLUSION**

19      Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state

20  unreasonably applied clearly established federal law or unreasonably determined the facts in

21  rejecting petitioner's claims.

22      For the reasons set forth above, it is RECOMMENDED that the petition for a writ of

23  habeas corpus be denied.

24      These findings and recommendations will be submitted to the United States District Judge

25  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14)

26  days after being served with these findings and recommendations, any party may file written

27  objections with the court and serve a copy on all parties. The document should be captioned

28  "Objections to Magistrate Judge's Findings and Recommendations." In his objections, petitioner

1  may address whether a certificate of appealability should issue in the event an appeal of the

2  judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must

3  issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

4  Any reply to objections shall be served on all parties and filed with the court within seven (7)

5  days after service of the objections. Failure to file objections within the specified time may waive

6  the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir.

7  1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8  Dated:  October 8, 2025

9

10  CAROLYN K. DELANEY
   UNITED STATES MAGISTRATE JUDGE

11

12  8, camp2369.fr

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28